I'll rise. The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We're happy to hear argument in our first case, Cox v. Snap. Mr. Raymonds? Good morning, and may it please the Court, my name is Anand Ramana. This is Betsy Hudson. We're lawyers with the law firm of McGuire Woods, and we represent the appellant in this case, Snap, Inc. May it please reserve seven minutes for rebuttal. We have presented to this Court two issues on appeal. First, we have asked this Court to determine the legal effect of a 2006 Memorandum of Understanding. Does it contain a promise to grant stock options, or does it contain both the promise and the performance? That is to say, does it contain both the promise to grant and actually grant the stock options to the appellee? In this case, Mr. Cox. Second, we've asked this Court to determine if the district court improperly calculated You talk up just a tad. Talk up just a tad. Pardon me. Thank you. I hear that rarely. Second, we've asked this Court to determine if the district court improperly calculated damages on summary judgment when there is strong competing evidence that the figures should be substantially less. Turning to the first issue, did the MOU grant the stock options, or was it only a promise to do so? The district court came to the peculiar conclusion that it did both, that it was both the promise and the actual document that granted the stock options itself. Like all contract analyses, we start with the document itself. It's actually very straightforward. Paragraph 1 of the document states on January 12, 2006, SNAP, our client, will issue a non-qualified stock option to Mr. Cox. So that's the promise. It's a very straightforward promise to do something on a certain date in the future. Which is the date that this document is dated. It is the date that this document is dated, and there are many reasons for that. But that doesn't necessarily mean that the executory promise, just because it's on the same date, couldn't have happened later on that same date. The difference here is that the document itself, does it grant the stock options, which there's nothing in this document that says that, or does it simply contain a promise to do something in the future, even if it's later that same date? Was there actually a stock option plan in place? Not at that time, Your Honor. Does that help or hurt your case? It helps our case, because later in the document, you'll see that there needs to be preparation of necessary documentation. And also in the document here, paragraph two, it talks about how the stock option plan will be subject to the stock option, I'm sorry, that the stock options will be subject to the stock option plan and the final agreement. The stock option plan was drafted and passed by SNAP a full month later. And as with the other employees that received stock options, the final agreement was simply one that exceeds to the stock option plan, that agrees with the terms of the stock option plan. Before you get too far down the road here, is it your position that you're entitled or your client is entitled to judgment as a matter of law, or that there is a material issue of fact here to be resolved by a jury? On this particular issue, on this particular issue, judgment as a matter of law, that this judgment should be reversed and final judgment should be entered. Because the district court – If you win on this issue, the second issue doesn't exist. That's correct. So that your answer is not with respect to just this issue. Your answer is you're entitled – you think you're entitled to judgment as a matter of law, right? That's correct. What I was trying to say, though, is if this court agrees with the district court's analysis and reading of the agreement, then it would be the second issue is what we're asking for is remand on an issue of damages. But you're right. This first issue is dispositive of the case. So you say that there's no ambiguity in this agreement because it would theoretically be possible to issue the stock options later that day? Correct. At any point in time. Really? Really. And if we look at the face of the document – Even without a stock option plan. That's correct. But at the point in time, if you read the plain language of this document, every single reference in this document that relates to the stock options is in the future tense. You look at paragraph 5. The stock options will not be assignable. Future tense. Paragraph 4. The stock options will be issued to Mr. Cox personally. It wouldn't say will be issued if this document was, in fact, granting no stock options. As I understand it, this was sent to him. Do you agree with this? I'm sorry? This was sent to him. It was said, do you agree with this? And if so, sign on. Is that right? That is incorrect. That is incorrect. Mr. Cox in his own deposition testimony, I believe it's pages 192, 193 of the record, goes to great lengths to discuss how he negotiated this agreement. I understand that. But in the form of the letter, what does it say? Well, the actual typing was done by the lawyers of SNAF. This isn't who wrote it. This is the form. What does it say? Is it in the form of a letter which says if you agree with these things, we have a contract? That's what this letter says. It's a letter, and it says that we will draft a contract, we will draft the stock option plans, and then once that happens and once we agree on the final agreement, once you exceed to the terms of the stock option plan, then you'll have the stock options. So your view then is that this is not a contract, but it's in essence an agreement to agree in the future? An excellent point. And, yes, I think one of the issues in this case is that. Is that your position? It is our position. And where you can see that is in paragraph 2, it says, except as set forth in this memorandum of understanding and the final agreement, the options will be otherwise subject to the terms of SNAF's stock option plan. Virginia Supreme Court regularly instructs us, including a case that came out just three weeks ago, that to be an enforceable promise, the contract must contain all material terms and conditions, and it also must manifest an intent to be bound at that moment to those materials and certain terms. The problem with this is it satisfies neither of those elements. The stock option plan is evidence. The reference to the stock option plan is what is important here. That stock option plan has many terms and conditions that are material. For instance, is this an incentive stock option or is it non-statutory? Is it governed by Federal law or not? So in your view, when Mr. Cox signed the letter, that did not create a binding contract? It didn't create a binding contract for the issuance of the stock options because there still needed to be a negotiation about the material and certain terms that governed those stock options. Well, it was a binding contract in any respect. No, because that would have been the consideration then. That's his consideration for this contract. So it is an agreement to agree in that sense. It didn't bind him to do certain things? That's correct. Right. So he received stock options, and in return he promised that his company was going to assist. Well, that's a binding agreement. That's a contract. It's not an enforceable agreement, though, because the only consideration that is flowing his direction is unenforceable as a matter of law because there is uncertainty of material facts, because there is no intent to be bound by this document, but perhaps by a later one that is to be negotiated. Well, that just suggests what your interpretation of the agreement is, just that the timing of performance, but it doesn't suggest there's not a contract. Even under your view of the facts, as I read it, there is a contract, but the contract was executory in the sense that there were still promises left to be fulfilled, including the promise that at some later date, according to your view of the agreement, to issue the options. And because there was never an issuance of the options, your client breached that contract, but the statute of limitations ran on that breach before a lawsuit was filed. Is that right? That's correct. I guess what I'm suggesting here is what Judge Agee raised. The argument is that these were executory promises, promises to do something in the future, SNAP promised to in the future issue stock options. What I was suggesting was that promise in and of itself has some very significant legal problems. It's insufficient as a matter of law because it does not contain material in certain terms. It does not contain an intent to be bound at this moment. All of the language in this document suggests and, in fact, states that this will all be subject, the issuance of the stock options will be subject to legal documents that are drafted and executed and negotiated in the future. So was that final agreement that's referenced in here intended to cover just the issuance of the stock or was it to be a comprehensive agreement that covered Mr. Cox's obligations to represent the company? Just the stock, Your Honor. And so this agreement contained the final terms with respect to his obligations? With respect to his and his company's obligations, yes. I think that you could make that argument. I haven't seen any evidence to suggest otherwise. But what it doesn't do, though. Can I just be sure? I wanted to go back to your answer to Judge Diaz. Mr. Cox says, I have stock options and you didn't pay. And you say, you have no option because this isn't final. We never issued stock options. We never issued stock options. So you don't have any possible claims. The statute of limitations is run because we never issued these stock options. Isn't then your issuance of the stock options the condition that is preventing him from having a claim? And so why doesn't this prevention doctrine come into play? So there's two. There are two ways to approach this problem. One is to characterize the issuance of the stock options as a promise, a SNAP's promise to do so, an obligation, a contractual obligation, one upon which they can sue. The other way to look at this is to consider it a condition precedent to his right to repurchase those options. And that's what I thought you said it was. I think it's both. You can make an argument that it is, in fact, both. Okay. The condition precedent here being the issuance of the stock options. Because those were not issued, that condition precedent was not satisfied. But you were the ones that prevented it from happening. So the prevention doctrine, though, is a doctrine that applies when a party affirmatively obstructs or blocks the performance. That's not what happened here, though. There was an absence of behavior. There was an absence of conduct, though. And so what you have is a situation where there was just nothing done. It wasn't as if he even asked us to do anything. It wasn't. Because he thought that you were doing it because of the contract. Well, there's nothing in the record that actually suggests that at the time, though. But that is the weakness in the condition precedent argument is, as Your Honor says, is that one. That is why I think when we go forward with this argument, what we've gone forward with is the promise argument. It's actually more simple than this. There were just promises going both ways. Our promise was to issue stock options to Mr. Cox, and his promise was to get his company to assist us. That promise was an executory promise, and it never occurred. And he had five years from the date of January 12, 2006 to sue, and he didn't do that. And he didn't do that because, and the record reflects this, there was a complete breakdown almost immediately in assistance. There was some assistance. Well, I suppose another interpretation is he didn't do that because he assumed he had the options and could wait until the date of the redemption, which was not until 2011. And several years after they had stopped speaking. Let me ask you this. So Judge O'Grady concluded that reading these terms in isolation, that is the fact that there was the date of the agreement is the same date as the purported issuance of the stock options, that that, as he put it, had the potential to cause confusion and some uncertainty as to what the contract meant. Then he looked further down the contract to paragraph 10, where the agreement talks about Cox's ability to require the company to purchase the shares, and goes into the particulars of how that was to occur, goes on to announce a date, valuation and payment provisions. And as he put it, it does not in any way suggest the SNAP was required to independently issue shares to Cox. And that, to him, suggested that the agreement was, in fact, the issuance of the shares. What's incorrect about that assumption? So what we have to do with this document is, as best we can, try to read it as a whole and read all of the language together. And he's right, His Honor is right, that in paragraphs 9 and 10, they are in the present tense. It shall have the ability to require. But we still have to do something with all of the language that refers to these stock options being issued in the future. And the best way to read them together is to simply, you know, this is a three-page agreement, is that paragraphs 9 and 10 are assuming that the stock options would be granted in the future. And so the way that you can read, in fact, the only way that I can read this consistently, this document, which we must try to do if we can, an unambiguous document, is to read all of the provisions consistently, is that we have it both ways, that the stocks options are to be issued sometime in the future, perhaps the same day, perhaps in a month. And once those stock options are issued, Mr. Cox shall have the ability to require the company to purchase his options at any time subject to the foregoing. What about the understanding of the minority stockholders that Mr. Cox has 5 percent of the company? The record is split on that. Both of the minority shareholders at that time, one of them didn't really have. Well, when you say the record is split, but this is on a motion for summary judgment, right? It is on a motion for summary judgment, so there's a genuine issue of material fact on this particular issue. What happens through the facts in the light most favorable to who? Well, obviously the appellee. However, there was a problem in the district court where the district court ignored the genuine issue of material fact in this particular instance. Well, if your position is that the contract is plain on its face, would the court be allowed to consider parole evidence? No, Your Honor, and that is one of our issues with the district court's ruling is that it went beyond the foregoing. On the flip side of that, if we conclude we can't figure out what this contract means, it's ambiguous, and you can consider the parole evidence, what does that do to your case? If it's ambiguous, then I think the court should have reviewed all of the evidence, and there is conflicting evidence about what the intent was. Doesn't it depend on the nature of the ambiguity? It seems like Virginia law makes a distinction between a latent and patent or patent ambiguity. Well, and this would be a latent ambiguity where, one, it's not apparent from the face of the document. Obviously, we've been fighting about this short document for some time, that it's a latent ambiguity. You say it's not apparent from the face of the document? Well, on this particular issue, it's not. I think later it's a big issue. What's the particular issue? On the issuance of the stocks. So that's a critical issue in the case. It is a critical issue in the case, but my point – So you say it's not clear on the face. No, I think it is clear. I think this is a – Well, what happens if we conclude that it's not clear on the face? If you conclude that it's not clear on its face, then this case should be remanded, because evidence should be taken from both sides. There is conflicting evidence in the record on what the intent of the parties were insofar as the issuance of the stock options. Because if it's unclear, if it's ambiguous, then that means this document doesn't clearly reflect what the agreement was. So then we do need to go outside the document and take evidence from both sides. We have that evidence. The evidence is conflicting, and we need to put that before a trial. Okay, so what evidence is there in the record that you all proffered to the district court that you say creates a genuine conflict with respect to the evidence from all the other shareholders? Mr. Singh himself, once he reviewed in his deposition, and it is attached to the motion for summary judgment, it may take me a moment to get to that exact site. Mr. Singh is one of the other stockholders. Correct. Correct. In his deposition, he testified that when reading that document, he realized that perhaps the stock was never issued because he knew that the stock option plan was never delivered. Is it your position that there is no option unless you issue a certificate? Not necessarily a certificate, no. I think in this case, that's not the case. In this case, the only thing that is required is what this MOU requires, which is the completion of the stock option plan and a final agreement that has Mr. Cox accede to the conditions, which were numerous. There are several limitations on those stock options that were not contained in this MOU. This paragraph 2 here must mean something, that except as set forth in the memorandum of understanding and the final agreement, the options will other be subject to the terms of the SNAP stock option plan. It has to mean something. Well, your client conceded on deposition that the memorandum of understanding is the final agreement. Those were twisted words in that he meant the final agreement of this MOU. If you go later in that deposition, those were taken out of context. He meant this particular exhibit in the deposition was the final version of the MOU. What terms with respect to the transfer of stock, the amount, the value, the rights and obligations of the parties with respect to the options are not in this document? That's a great question. That can be found actually in the stock option plan, whether these are incentive stock options that are governed by 26 U.S.C. 422 or non-statutory stock options, the type of stock options, whether they are for common stock or whether they are for preferred stock, whether there's an expiration date. There is 10 years, but you won't see it in the MOU. You'll see it in the stock option plan. The effect of improper behavior, what if Mr. Cox is convicted of fraud or something? It says in this document that all those terms are reserved for another document. No, I'm sorry. I must have misunderstood. It doesn't say in the MOU. It says in the stock option plan. My understanding of the question was what terms are missing from this MOU? What material terms are missing? Well, you can make up all kinds of terms. You have a contract and you say, well, it's not sufficient, because there is this whole volume of extra things that should be in it. But if you call it the final agreement. But we didn't call it the final agreement. We actually specifically stated in the MOU that there would be a final agreement with all of these important additional terms. It says MOU and the final agreement and the stock option plan indicating there were going to be a number of material terms that were going to be presented to which these stock options would be governed. And that's exactly what happened with everybody else, and that's what happened with Mr. Cox. It's just that he never received the stock option plan. He never signed onto the agreement. He never saw the terms and conditions or the restrictions or the expiration date or what types of stock options or the transferability. Well, transferability is governed by this. There are many other material terms that govern these stock options that were contained in a document specifically referenced in the MOU, yet not created. And those materials. But not created. But not yet created. But that's what this document says. I think your time has expired, but you have some time in rebuttal. You can use it now or you can wait for it. No, you're asking one additional question. Of course. Yes. What does Judge O'Grady seem to think is significant that the agreement was drafted by your client? Do you agree? First of all, do you agree with that? And second, what's your view of that argument? I don't agree. As a matter of fact, I don't agree that it was drafted by our client. It was typed out by our client. Mr. Cox in his deposition went to great lengths to discuss how involved he was in the negotiating process. I think he said every single provision of every single subsection he edited, not the future tense of it. So as a matter of fact, I don't think that the contra-preferendum argument should apply, both sides. Is that another issue that would have to be resolved at trial if this case were to go to trial? If it was remanded, I think that would certainly be an issue of fact, yes. So you see your client as a scrivener, not an author? Correct. If I may, Your Honor. Thank you. Good morning. May it please the Court. Nick DePalma on behalf of the appellee, Curtis Cox. I'm of the law firm Venable LLP, and I just wanted to start. I wrote down some of the questions the Court asked my colleague. The first question was from Judge Diaz. Was there a stock option plan in place? Does that help or hurt your case? And the answer from my colleague was, well, that helps our case. I would answer that question, it hurts their case. Because this agreement, the contract in January 2006 was a binding document. They didn't have the stock option plan in place. And in paragraph 2 of that agreement, they say, except, meaning it's an exception, as set forth in this Memorandum of Understanding and the final agreement, comma, the options will be otherwise subject to the terms of SNAP stock option plan. So nothing in SNAP stock option plan can take away the rights that they granted Mr. Cox in this agreement. That's because this paragraph 2 exempts that. So that's why I would have answered that question. Well, that's one way to read that. You could also read it that unless the terms of the final agreement and the stock option plan were different, they could change the terms of the Memorandum of Understanding. That would seem to be suspect to two different readings. I'm sorry, Your Honor, if the terms are different, if the stock option plan has terms different than this contract. Right, or the final agreement. Or the final agreement. Your Honor, I don't read paragraph 2 that way because paragraph 2 seems to establish a list of priority with this document taking priority over the stock option plan. What about the final agreement? Well, Your Honor, I don't agree that there was a mischaracterization of what the final agreement is. In this document, this contract. Well, it says this Memorandum of Understanding and the final agreement, which would seem to indicate they're two different documents. It would seem to indicate that, Your Honor. However, their corporate representative testified this was the final agreement, this was poor drafting. And there's language in here, final agreement, necessary documents, necessary documentation, and final agreements. So we don't have any reason. Your opposing counsel says that that reference in the deposition was to the final version of this Memorandum of Understanding, not the final version of any of the other agreements, which would seem to be a subject in dispute that would require some sort of evidentiary finding, if you got to that point. Well, Your Honor, I understand the question. I disagree because the question to that witness in the deposition was, what does the final agreement referring to, what is that referring to? And he said, it's referring to this Memorandum of Understanding. So when a corporate representative under 30b-6 testifies to that, that's binding on the corporation. I don't think there is an issue for trial on that. The issue for trial would be, this is the final agreement. Your Honor, another question that I heard was, and this was from Your Honor, Judge Agee and Judge Diaz, could it have happened later that day? Could he have gotten the stock option? Could he have gotten the certificates later that day or the plan later that day or whatever? The unknown, undefined thing that is not required under Virginia law, but they're maintaining had to happen before he had stock options. And the answer to that is no. They conceded, it's the end of the day, he's not going to get anything that day, and I don't think anyone intended him to get anything that day. And no one conducted themselves as if he needed anything further. And then, Judge Motz, you asked the question, was this a contract? Meaning, did it say if you agree, if you're in agreement with these terms, sign here and you're bound? And the answer to that question, I think, should have been yes. Everyone's bound. It's not unilaterally binding on the plaintiff, Curtis Cox, but not binding on the defendant, Snapp. It's binding on everyone. And then my colleague, when he was arguing, said, here's the terms of the contract. He received stock options and he promised assistance. And those are the essential terms of the contract, that he received stock options and he promised assistance. And the material terms, the essential terms of the contract, they're all there. We know how many stock options he received. It was 308 shares. We know what the percentage of the company he received. It was 5% of the company. We know that if they did a stock option plan, as they were intending to do, that his shares would increase proportionately. And we knew that he could realize value in three ways from this stock options grant. One, he could elect to purchase that amount of the company, and then we would be in a situation where he might need a share, if he elected to purchase the company and receive a share. Or, Snapp could purchase his stock options from him. That's paragraph 9 of the letter agreement. And that uses language that Judge O'Grady pointed out is in the present tense. Snapp has the ability to repurchase the options. And then there's limitations. There's conditions to Snapp's ability to repurchase the options, such as, again, the passage of time, because they wanted to have five years pass to see if Mr. Cox's assistance grew the business, before he could exercise his options or before Snapp could repurchase them. Paragraph 10, again, it gives Mr. Cox the ability to repurchase those options. After five years, and it's very clear, can't do it before five years pass. That's January 1, 2011. And it sets a formula for the price, and it sets a formula for the timing, meaning Snapp doesn't have to pay him right away. They can pay him over time, but he gets interest. They have to pay him within five years. So there's no material term that is missing from this. And no material term that's missing from this was ever proffered to Judge O'Grady below on the summary judgment record. I thought that your colleague, in his arguments, talked about all kinds of things that had to be done. He sort of had a list of them. You're right. Those were not proffered to Judge O'Grady in opposition to summary judgment. But none of those is it preferred or common. There's been no argument that Cox had anything less than 5 percent. It's actually defined in paragraph 1. Snapp currently has 4,926 shares issued and outstanding and an additional 1,232 shares representing 20 percent of the authorized shares reserved for various people. On January 12, 2006, the same date as the contract, Snapp will issue a non-qualified stock option to Cox, granting him the right to purchase 308 shares, representing 5 percent of the total authorized shares of Snapp. So it is the total authorized shares of Snapp. So you would draw the inference from that that that has to be common stock because every corporation would have to have common stock. I think that's correct, Your Honor. I agree with that. But if for some reason I'm wrong and the authorized shares are part common, part stock, what's being described here, then Mr. Cox would have 5 percent of both because it says it's 5 percent total. It doesn't make a real difference to you what kind of stock it is because what you're doing is... We're selling the option. Yes. That's correct. And then, Judge Diaz, you asked the question. Judge O'Grady said, does this have the potential for confusion, these varying verb tenses? And then you mentioned paragraph 10 does not suggest that Snapp was required to independently issue shares. What's incorrect about that? And I agree wholly with Judge O'Grady's holding. There's nothing incorrect about that. There's the same date. There's future language in some of these, but it's the same date. And then you have present language in paragraph 9 for Snapp's repurchase. Paragraph 10 you have shall, Mr. Cox shall have the right to require the company to repurchase his options. But that makes sense because he can't do it for 5 years. So do you equate the statement of confusion as tantamount to a suggestion that the contract is ambiguous and, therefore, the court should have looked outside the four corners of the document? Your Honor, I have, first, I think what Judge O'Grady was ruling was, I don't think it's ambiguous when I look at the whole document because I can see a desire to convey shares. So confusing is different than ambiguous? Right. But if these different dates and verb tenses are ambiguous, then we construe the document against Snapp. And with regards to ambiguity, Your Honor, if they are ambiguous, they would be patently ambiguous, not latent ambiguous, because it's apparent from the face of the document. You have these four different references, final agreement, final agreements. What are those? Necessary documents and necessary documentation. And then you have the same verb tense for the date and the issuance. And then you have the present verb tense for paragraph 9, the future verb tense for paragraph 10. So if that's ambiguous, it's patent, it's on the face of the document. And that's why I believe Snapp's corporate representative testified it's a very poorly drafted document. You know, he wanted it to say you don't get the stock options until we hand you a certificate. Well, I don't think anybody's going to argue with that point. Thank you, Your Honor. I'm sorry. I'm not understanding your answer to the question. It's probably me. Is it your understanding that the district court found that the contract was clear and clearly said what you said, was not ambiguous, but that if it was ambiguous, this other evidence determined, supported the view, your view of it? Is that what you think the district court did? No, Your Honor. I think the first two parts of your question, correct. The court said it was clear, issued the options. But if it's not clear, I think it's patently ambiguous, and we construe it against Snapp because Snapp admitted in the RFAs that it was the drafter and Mr. Cox was not the drafter. Your opponent says there's a dispute about that, about who the drafter was because your client apparently had the opportunity to line through certain provisions of the agreement, was actively involved in the negotiation. Well, let me answer that question, Your Honor. My colleague did say that. However, in the RFAs, which makes a subject conclusively determined, they admitted that their lawyer drafted the agreement and that Mr. Cox did not draft the agreement. Now, the facts are that Mr. Cox went to their lawyer's office without a lawyer, and their lawyer and Mr. Gupta, Mr. Cox went over this, and I imagine they talked about the amount of the share and that sort of thing. Mr. Cox specifically said he had nothing to do with the verb tense. That's undisputed. And they admitted in the RFAs that he did not draft it. And we cited at least one Fifth Circuit case, but it's also in the language of Rule 30 that RFAs are conclusively established. So it's no longer open to interpretation. Do you have a handy cite for the admission that counsel for the appellants is the one who drafted this? I do, Your Honor. It's in my brief in the ambiguity section. Just give me one moment. JA 393, is it that? No, it's page 19 of Appley's brief. And what we do at the very top of page 19 is we provide JA Joint Appendix 559, Defendant's Answers to Plaintiff's Requests for Admissions, Numbers 3 to 4. And that's the one that SNAP admitted that its attorney drafted the document. And then we say SNAP admitted that Cox did not draft the document. That's Joint Appendix 558, Defendant's Answer to Plaintiff's Requests for Admission, Number 2. And then we provide the cite for Rule 36B, which is these facts are conclusively established. And then the closest case, certainly not binding on this Court, but it is from the Fifth Circuit, 2001. Since Rule 36 admissions, whether expressed or default, they cannot be overcome at the summary judgment states by contradictory affidavit testimony or other evidence in the summary judgment records. There's a procedure by which one can move to set aside an RFA, but it wasn't done here. It has not been set aside. So the record is that Cox did not draft it. SNAP drafted it. I will say that in reading the cases that SNAP cited on the reply brief that said it shouldn't apply when two parties participate, the first one of those cases, the gentleman was an attorney and had an attorney. So an attorney was participating in the drafting. And the second one of those involved a settlement agreement that was drafted by both sides. And the record's silent on the involvement of attorneys, but my assumption is that attorneys were involved. Here, SNAP had an attorney. Mr. Cox didn't. So I don't think there's a compelling reason to not apply that here, even under the case of SNAP cited. What about this evidence with respect to the other shareholders? How do we consider that? Do we consider that? Your Honor, if we conclude that the agreement clearly granted stock options to Cox, we don't consider it. If we conclude that the agreement was ambiguous as to whether it did, we construe it against SNAP. We don't have to consider it. Only if we believe that there's a question about whether the agreement actually granted options to Cox do we then look at what happened. And that's where we contend the evidence is undisputed. Both owners testified it granted to Cox. We had their lawyer email. We had the ownership redemption agreement where they recognized the grant. I thought that your colleague on the other side said there was a disputed fact with respect to those people. Well, the only disputed fact, Your Honor, is that upon being shown the document in the deposition, they said, oh, well, I'm reading it now. I see that there's an argument something more be required. Who's saying that in the deposition? That was Inderbir Singh. There's three owners, Inderbir Singh, Vivek Bali. So he's one of the stockholders of SNAP. At the time he was. And at the time he said this gave Cox 5% of the company. But in the deposition it was, well, now I'm reading it. I see your argument. And that's why I say there's no genuine disputed material fact because these are just folks interpreting the contract themselves now as opposed to what their understanding was at the time and what happened. So I'm sorry. So what was the, there's a conflict between what he said then and what? What he said. There's no conflict between what he said and did then. The only issue is I think it was on, I don't remember what point. What is the then? The then is in 2006. He said maybe I see your argument. Yeah, in 2006 he signed the agreement, give Cox 5%. Now today in 2015 I'm looking at it and I see your interpretation is, you know, it wasn't, it didn't have anything to do with the facts at the time. So in 2006 he, when he signed the agreement getting out, he recognized that Mr. Cox was getting out. That's correct, Your Honor. I see. Okay. Do you have other evidence? So there's conflicting evidence on Singh potentially as to his interpretation of the contract. But then do you have other evidence, is that right, from the other stockholders, Guptan? Vivek Bali. Yes, Your Honor. Did they say the same thing or other representations in the record that this, that we accounted for stock going to Mr. Cox? Singh and Bali say that expressly. The main remaining person, Navneet Gupta, does not admit that. But he did sign the ownership redemption agreement where they admitted and recognized they granted the options to Curtis Cox. He's the principal. He bought out the other two years later. And we have case law that you can't create a material dispute effect disagreeing with yourself. Especially when what you're disagreeing with is what you think the contract means, Your Honor. And, Your Honor, my time's expired. However, I also think that Your Honor was absolutely correct with the application of the prevention doctrine. This is a picture perfect case for prevention doctrine if we lose the first three premises. Thank you. Thank you. Thank you. If I may, there are three references in the record that we've been discussing. I'd like to just identify them. The first reference is the reference in the record to Mr. Gupta, our principal. Characterizing this is the MOU that's on page 393 of the record. The question, okay, what is the final agreement referring to in this paragraph? Answer, to the final agreement of this MOU. And then it goes on to explain that. And also you need to agree to the stock options. That's on page 393. On page 419, this is the conflict in evidence of the principals on whether these stocks were issued. Starting at 418, Mr. Singh, who is an old principal, no longer a principal, while they read that they will be fully vested when granted, yes, question. And that indicates that the granting will happen in the future sometime. There's some objections there. And the answer, will be vested when granted, yes. That's how. So in the future, answer, yes. So Mr. Singh is saying that this is an executory promise. There's conflict in evidence. But he had already signed something, right? He had already signed an owner redemption agreement. But the owner redemption. Which recognized the rights of Mr. Cox. It recognized that there was a dispute with Mr. Cox. It says a dispute in there? I don't think so. But it references promise. Okay. It talks about the promise. Promise is different than dispute. Well, but that's what that the purpose of that paragraph was that. Okay. Do you know where that is? Can we look at that together? Yes. Yes, it is. It's in the owner redemption agreement that is found. Court's indulgence. I'll find it. It's all right. The language in there discusses that it was a promise. Sorry? The language in the owner redemption agreement refers to the promise to issue Mr. Cox stock options. And this, remember, was executed one month after the first demand was made. So there was a recognition that there was going to be, there was a dispute, which is why that paragraph was drafted and why it was included. Tell us about the admissions because what appears at 558 and 559 seems to contradict what you had represented earlier. That's correct. I think at that time it's different than what the record that the depositions played out as. What was admitted in that was that the scrivener versus drafting, and quite frankly I think there was just, SNAP was the drafter in the sense that it was the scrivener, and it wasn't until later in that litigation. It says it drafted. It didn't say it took dictation. It admits that the drafter of the agreement was your client's lawyer. So why would we in that circumstance, if we determined it was ambiguous, not construe any ambiguity against your client? Because the evidence at the deposition that was taken three days before the close of discovery and months after that admission, when frankly without the knowledge of ours, and it's on record page 651, Mr. You can't, you admitted this. Did you ever tell the district court that you were not admitting it now? No. Did you ever attempt to withdraw it? No, we did not. However, we did. It doesn't just, it says without waiving this objection, SNAP admits that Mr. Cox did not draft the letter agreement. And not even. Which was eventually contradicted by Mr. Cox on page 651 on the record as his deposition. Question, you said that you did take part in some editing on January 12th. Is that right? I did. That's a good question. But you don't know what parts were edited. You just remember that there were some edits. That's my question. His response is, I believe all parts were edited in that meeting. And he goes on to say all parts, as in each subsection, was edited in that meeting. Not every word, but each, every area was addressed in that meeting to make it. So Mr. Cox is actually contradicting. We have two admissions going the other way. My client wasn't at that meeting. So he didn't know about it. Did Mr. Cox say in his deposition that he drafted this? He doesn't use that verb. Did he have a lawyer with him? He did not. Was it your lawyer he was talking to? It was our client's other lawyer. That's correct, Your Honor. If I may just briefly address the second issue, and I think it's briefed well in our papers. The formula, the textual formula for the calculation of damages is agreed on. What is not agreed on is the 2005 valuation. There's really two ways to read this. One is to completely ignore the second sentence, which is what Mr. Cox in the district court did. The only way that we can read this consistently is by reading both of them, and that is to use the $12 million figure as the 2005 valuation. It's in the MOU. Mr. Cox has alleged it in his complaint as the valuation is $12 million. In his 2011 demand, he uses the $12 million figure as the valuation figure. And Mr. Gupta in his deposition, unrebutted on the record, explains why they use the $12 million figure for the 2005 valuation. That's not what the district court used. That's not what Cox even argued until summary judgment was to be used. They used a much lower figure, which, of course, inflates their damages. It's our view that using that $12 million, assuming that the district court, that you, that Your Honors, agree with the district court on the first issue, that the damages should be substantially lower. Everybody agrees on what the 2010 valuation is. But the difference is, and there's conflicting evidence on this, and it was an error for the district court to use only the evidence that was proffered by Mr. Cox in this case. Should have at least put that issue to a jury on damages, and it was an error to do so. So for all these reasons, Your Honor, we, the MOU is an executory promise. It can't be both. It's illogical for it to be both. Why would you promise? Oh, I'm sorry. I'm over 138. Right. Thank you. Thank you. We will come down and greet the lawyers and then go directly to our second case. All rise.
judges: Diana Gribbon Motz, G. Steven Agee, Albert Diaz